[Civ. No. 1048. Fifth Dist., Nov. 14, 1969.]

TRINIDAD SANCHEZ, Plaintiff and Appellant, v.
CENTRO MEXICANO OF SACRAMENTO et al.,
Defendants and Respondents.

## Counsel

Colley & McGhee and Nathaniel S. Colley for Plaintiff and Appellant.

Perkins, Carr & Anderson and Eugene Anderson for Defendants and Respondents.

## Opinion

**STONE, P. J.**—Plaintiff filed this action to determine the validity of an election of a board of directors of defendant corporation, Centro Mexicano of Sacramento, which, in turn, rests upon the validity of the sale of shares to some of the stockholders who participated in the election of the board members.

Prior to 1948, a non-profit corporation called Comite Pro-Hogar Mexicano was formed by Mexican-American leaders in the Sacramento area. In 1948 it had approximately $7,300 in its treasury and owned land of a value of $7,500. On April 1, 1948, the leaders of Comite Pro-Hogar Mexicano and other members of the Mexican colony in Sacramento formed a California stock corporation, called Centro Mexicano of Sacramento, hereinafter called "Centro." The initial capital consisted of the cash and land donated by the non-profit corporation.

The purposes of Centro, as stated in its articles of incorporation, were (1) to provide a center for recreation and social work activities for the local population of Mexican citizenship or Mexican ancestry, and (2) to

develop a civic spirit among the Mexican colony and act as a medium of contact between the Mexican people and the rest of the city's population. It was anticipated that Centro would finance its activities by renting a hall to be constructed on the land donated by Comite Pro-Hogar Mexicano.

Two permits were obtained to sell shares of stock, and 3,800 shares were issued and sold at $5 per share prior to January 1, 1965. The proceeds thereof, along with the $7,300 contributed by Comite Pro-Hogar Mexicano, were used to construct the present Mexican center owned by Centro. Between April 1948 and 1950, Centro improved its real property and purchased furniture and equipment in amounts which totaled around $40,000. In the early years Centro accumulated a small cash balance, but as of December 31, 1951, there was a net loss of $3,381.30.

In 1951 Centro leased all of its assets to a non-profit corporation, Societe Social Jose Maria Morelos, hereinafter referred to as "Morelos," which operated the center until April 17, 1966. The lease called for rent to be paid to Centro; it appears that no rent was ever paid direct to Centro, although Morelos paid existing debts and certain expenses of Centro. As of April 1966, the pertinent date herein, Centro owed approximately $800 property taxes, and had cash assets of $70 derived from the sale of 14 shares of stock.

During 1965 and the early part of 1966, a number of shares of stock were purchased by defendants Herman Mendoza, Agustin Anaya and Juvenito Gomez, from other shareholders, at $5 a share. Entries reflecting the transfer of said stock were made on Centro's books by the secretary. Upon acquiring a majority interest, they caused a stockholders meeting to be called for April 17, 1966, by giving written notice to all persons shown on Centro's books to be shareholders as of that date. More than one-half of the shares were represented in person or by proxy at the meeting at which the new directors were elected. Plaintiff seeks to unseat them by this action, upon the ground many of the shares voted at the meeting were obtained contrary to the corporation bylaws, which made the election void.

■ The principal ground urged by plaintiff is that the shares of stock sold by shareholders in 1965 and 1966 were not offered for sale to Centro for a period of 30 days before sale to individuals, in accordance with article VI of the bylaws of Centro Mexicano of Sacramento, which provides: "In the event any shareholder of the corporation shall desire to sell or otherwise dispose of any share or shares of stock owned by him he must first offer to sell the same to the corporation for a period of thirty days; and, in the event the corporation does not exercise its right to purchase his share or shares of stock within the aforementioned period of time, then said shareholder shall have the right to sell his share or shares of stock to any one else."

Defendants contend this provision of the bylaws unreasonably restricts the right to transfer property and is unenforceable. In considering the question in general, the Supreme Court said, in *Coast Bank* v. *Minderhout,* 61 Cal.2d 311, at page 316 [38 Cal.Rptr. 505, 392 P.2d 265]: "A corporation can restrict the transfer of its shares because of the interest of shareholders in the persons with whom they are in business." Moreover, we think the particular restriction is within the ambit of Corporations Code section 501, which states: "The by-laws of a corporation may make provisions not in conflict with law or its articles for: . . . (g) Special qualifications of persons who may be shareholders, and reasonable restrictions upon the right to transfer or hypothecate shares."

In *Tu Vu Drive-In Corp.* v. *Ashkins,* 61 Cal.2d 283 [38 Cal.Rptr. 348, 391 P.2d 828], the Supreme Court discussed the import of the term "reasonableness" as used in section 501. A number of cases are cited, where bylaws considerably more restrictive than those in the case at bench were deemed reasonable when viewed in relation to the nature of the corporation and the purpose of the restriction. The *Tu Vu* case itself presents a most extreme set of facts in that the restriction upon the right to transfer was embodied in bylaws adopted by the corporation without the stockholders' consent, and *after* the shares had been acquired.

Centro was organized to promote the cultural interests of Mexican-American people in the Sacramento community. Certainly the restriction in article VI of the bylaws is not opposed to public policy; to the contrary, it has a laudable purpose—to prevent the stock from falling into the hands of people uninterested in Mexican-American culture. We find the restriction reasonable, and within the purport of Corporations Code section 501.

However, even though we conclude that the restriction upon the sale of stock, requiring an offer of the stock to the corporation for 30 days prior to sale to a third person, is not unreasonable and not in violation of section 501, this does not dispose of the case.

The trial court found that compliance with the restriction was excused because Centro, for reasons discussed hereinafter, was unable to meet the code requirements restricting the right of a corporation to purchase its own shares. Thus to offer the stock to the corporation for 30 days prior to the sale to defendant stockholders would have been an idle act. In testing the lower court's reasoning, we note preliminarily that were a corporation permitted to deal in its own shares without regulation, many abuses might result; consequently the power of a corporation to purchase its own shares is strictly regulated by California corporation laws. (See Ballantine & Sterling, California Corporation Laws (4th ed.).) Turning to the Corporations Code, we find that the section primarily applicable is 1705, which provides that: "A corporation shall not purchase directly or indirectly

any shares issued by it or by any corporation of which it is a subsidiary, execpt as authorized by Section 1706, Section 1707, or Section 1716."

The conditions laid down in section 1706 and 1716 do not apply to the facts of this case, but section 1707, which is applicable, provides that a corporation may purchase shares issued by it, or by a corporation of which it is a subsidiary, "Subject to any limitations contained in its articles, out of *earned surplus.*" (Italics added.)

The question thus narrows to whether Centro had an earned surplus at any time during the years 1965 and 1966, so that it could have purchased the shares before they were sold to defendants, in short, whether the record supports the finding of the trial court that to have offered the shares for sale to the corporation for 30 days would have been an idle act.

The record reflects that Centro's real property was worth $80,000. Plaintiff testified that a bank officer advised him that he would loan the corporation any amount at any time to purchase its own stock. But the real property belonging to Centro was not "earned surplus," it was a capital asset. It also seems clear enough that borrowed money obtained by use of capital assets as security is not earned surplus. Although we find no case defining "earned surplus," and none has been cited to us, in a footnote to Ballantine & Sterling, California Corporation Laws, *supra,* pages 256 and 257, we read: "The New York Bus. Corp. Law § 102 (a) (6), adopts the following definition: ' "Earned surplus" means the portion of the surplus that represents the net earnings, gains or profits, after deduction of all losses, that have not been distributed to the shareholders as dividends, or transferred to stated capital or capital surplus, or applied to other purposes permitted by law. *Unrealized appreciation of assets shall not* be included in earned surplus.' . . . 'Surplus consists of *capital surplus,* and *earned surplus.* Capital surplus comprises paid-in surplus and revaluation surplus, that is, all surplus other than earned surplus. Revaluation surplus is the appreciation recognized as arising from an appraisal of fixed assets.' (Citation.)" (Italics added.)

So far as the record before us shows, Centro had no means of buying its own stock other than by utilizing its capital, either directly or as security for a loan. Thus the record supports the finding that Centro had no earned surplus at any time pertinent to the transactions here involved. Since Centro could not have complied with the provisions of section 1707 of the Corporations Code it would, indeed, have been an idle act to offer capital

stock to it for purchase within 30 days before selling to the individual purchasers.

The judgment is affirmed.

Gargano, J., concurred.

A petition for a rehearing was denied December 11, 1969, and appellant's petition for a hearing by the Supreme Court was denied January 21, 1970.